Joseph Timothy **KEEL**, Petitioner—
Appellant,

v.

James B. **FRENCH**, Warden, Central
Prison, Raleigh, North Carolina,
Respondent—Appellee.

Joseph Timothy **KEEL**, Petitioner—
Appellant,

v.

James B. **FRENCH**, Warden, Central
Prison, Raleigh, North Carolina,
Respondent—Appellee.

Nos. 97–34, 98–6.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 22, 1998.

Decided Dec. 7, 1998.

**ARGUED:** Jay Hardin Ferguson, Thomas, Ferguson & Charns, L.L.P., Durham, North Carolina, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Brian Michael Aus, Durham, North Carolina, for Appellant. Michael F. Easley, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee.

Before MURNAGHAN, WILLIAMS, and MOTZ, Circuit Judges.

## I.

MURNAGHAN, Circuit Judge:

Joseph Timothy Keel ("Keel") appeals from the dismissal of his petition for habeas corpus relief. He has presented several claims, some of which were deemed to be procedurally barred by the district court. Other claims, such as his ineffective assistance of counsel claims relating to trial counsel's failure to raise a *Batson* challenge and failure to introduce certain evidence during the guilt/innocence phase of the trial, were dismissed without a hearing. Although we find that Keel's arguments are not procedurally barred, we affirm nevertheless.

## II.

Keel murdered his father-in-law, John Simmons ("Simmons") on the evening of July 10, 1990. Three days after the shooting, Lieutenant Jerry Wiggs of the Edgecombe County, North Carolina Sheriff's Department interviewed Keel. Keel made a statement which Wiggs wrote down and Keel signed.

Keel admitted that he had shot Simmons on the hog farm on July 10, 1990. Keel stated that he had asked Simmons for a ride to the farm, and upon their arrival had picked up the farm truck. He drove ahead of Simmons to the farm building and went inside. When Simmons arrived, Keel fired a shot into the cab of Simmons' truck. Simmons got out of the truck and said he had been hit. Keel told Simmons to sit down inside. Keel stated that he then shot Simmons again because Simmons had a knife and was coming after him. Keel said that Simmons fell, but got up again, and Keel then helped him to the truck. He stated that he did not know why he had shot Simmons in the first place.

At trial, Keel introduced evidence that, at the hog farm, he and Simmons had argued about a prior dispute between them. The two men had a fist fight, during which Simmons sustained some injuries. Simmons allegedly picked up a knife and pushed Keel to the floor. Keel then fired the pistol once, hitting Simmons and knocking him down. He then went to assist Simmons, put him in the truck, and drove it up to the office. He then went inside the farm truck and pulled out the rifle. Keel went inside the office and fired a shot through the window and into Simmons' head as the latter was sitting in his truck. Keel also introduced evidence tending to show that he had been drinking and using cocaine on the evening of the killing.

On August 20, 1990, the Edgecombe County Grand Jury returned a true bill of indictment charging Keel with one count of first degree murder. Keel entered a plea of not guilty and was capitally tried at the August 12, 1991 Criminal Session of the Superior Court, Edgecombe County, for murder in the first degree and sentenced to death. Concluding that the trial court had committed prejudicial error on the basis of an erroneous jury instruction, the North Carolina Supreme Court held that Keel must receive a new trial. *State v. Keel* 333 N.C. 52, 423 S.E.2d 458 (1992).

Keel was again tried capitally during the March 5, 1993 Criminal Session for murder in the first degree. The jury returned a guilty verdict. At the conclusion of the separate capital sentencing proceeding conducted

pursuant to North Carolina General Statutes § 15A–2000 (Supp.1994), the jury recommended that Keel be sentenced to death. The jury found that Keel had previously been convicted of a felony involving the use of violence to the person, a statutory aggravating factor. The jury also found eight mitigating circumstances, but nonetheless recommended death. On March 30, 1993, the trial court entered judgment sentencing the defendant to death.

After his conviction and sentence, Keel again appealed to the North Carolina Supreme Court. The Supreme Court unanimously voted to uphold the verdict. *State v. Keel,* 337 N.C. 469, 447 S.E.2d 748 (1994). Keel filed a petition for writ of certiorari to the United States Supreme Court. This petition was denied on February 27, 1995. *Keel v. North Carolina,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 147 (1995).

Upon the State's motion, by order of the Edgecombe County Superior Court, Keel was scheduled for execution on July 21, 1995. Upon Keel's motion in the North Carolina Supreme Court, that court ordered a stay of execution on July 13, 1995. In that order, Keel's post-conviction counsel was given 60 days in which to file a Motion for Appropriate Relief (habeas corpus) in the Edgecombe County Superior Court. No such motion was filed. Having no claim for appropriate relief or collateral review before it, the superior court was obligated to set a new date for Keel's execution. On November 2, 1995, the Edgecombe County Superior Court held a hearing pursuant to North Carolina General Statutes section 15–94, and set a new execution date for January 2, 1996. Keel's Motion for Stay of Execution was denied by the court on December 22, 1995.

On the same day, Keel's post-conviction counsel filed a Motion for Appropriate Relief in the superior court. Keel's subsequent Motion for Stay of Execution, Petition for Writ of Certiorari (to review the order of the

Superior Court of Edgecombe County denying the stay of execution) and Petition for Writ of Supersedeas (to overturn the order of the Superior Court of Edgecombe County enforcing the sentence of death) were denied by the North Carolina Supreme Court on December 27, 1995. On January 18, 1996, upon the State's motion, the superior court declared Keel's Motion for Appropriate Relief procedurally barred for failure to file in a timely manner.

Having exhausted his claims for collateral review and habeas corpus relief in the courts of North Carolina, Keel moved the district court for a Stay of Execution on December 28, 1995. The district court ordered a stay of 30 days during which Keel was ordered to file a habeas corpus petition. On January 24, 1996, the district court denied Keel's Motion for Modification of its December 28 order.

On January 29, 1996, Keel filed the instant Petition for Writ of Habeas Corpus.

### III.

#### A. *Preliminary Matters*

■ Before we begin our discussion, we should note that the instant case is governed by pre-AEDPA law.[1] We also note that the parties have stipulated that Keel has either exhausted his remedies, or the state has waived the exhaustion requirement. As Keel's appeal raises issues of law that were decided below, we will review them *de novo. See Beaver v. Thompson,* 93 F.3d 1186, 1190 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 553, 136 L.Ed.2d 424 (1996).

#### B. *The North Carolina Procedural Bar*

Keel first argues that the Court of Appeals should remand claims II.B. and II.E. to the District Court for a determination on the merits because they shared the same procedural posture as the three claims (II.A.(1), II.A.(3) and II.B.(1)) that Judge Boyle recon-

---

1. Keel filed his federal habeas petition on January 29, 1996. The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104, 132, 110 Stat. 1214 (1996) ("AEDPA"), was not enacted until April 24, 1996. Under the rule recently announced by the Supreme Court in *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997), the AEDPA's new standards of review are inapplicable to Keel's petition. Moreover, as North Carolina had not "opted in" to the AEDPA's procedural requirements at the time Keel's post conviction review became final, Chapter 154 of the AEDPA also is inapplicable to Keel's case.

sidered and determined were not barred procedurally. Although we find that Keel's claims are not procedurally barred, we nevertheless affirm because his claims are foreclosed as a matter of law.

In its order of December 10, 1997, the District Court barred, *inter alia*, claims IIB(1) and IIE because they had not been timely filed as required by N.C. Gen.Stat. § 15A–1419(a)(4). N.C. Gen.Stat. § 15A–1419(a)(4)(1995) provides grounds for denying a Motion for Appropriate Relief ("MAR") where the "defendant failed to file a timely motion for appropriate relief as required by G.S. 15A–1415(a)." [2] *Id.* The state supreme court gave Keel sixty days to file a MAR, a deadline that he failed to meet.

At the hearing on the State's motion, the District Court reconsidered its order and concluded that certain of Keel's claims were not barred under § 1419(a)(4) because the Superior Court had denied Keel's Motion for Appropriate Relief before the statute became effective.[3] Keel filed his motion on December 21, 1995, or two months after the expiration of the sixty-day period that the state supreme court had granted him on July 13, 1995 to file the motion. Because Keel missed the court imposed deadline, the Superior Court denied Keel's Motion on December 22, 1995.

Keel's two claims not mentioned in the district court's amended order cannot be barred by N.C. GEN. STAT. § 15A–1419(a)(4), because the statute was not in effect when Keel murdered his father-in-law. As Claims IIB(1) (due process violation to

submit Keel's involuntary manslaughter conviction to the jury as an aggravating factor in sentencing phase) and IIE (failure to inform the jury of Keel's eligibility for parole) were in the same procedural posture as the three claims found not to be procedurally defaulted, they likewise cannot be deemed procedurally defaulted. Therefore, the question is whether Keel's failure to file his MAR within the state supreme court's sixty-day deadline forecloses federal review of his claims.

Where a procedural default on a state law issue in state court occurs, the defendant generally is precluded from raising that issue in a federal habeas corpus motion. *See Sawyer v. Whitley*, 505 U.S. 333, 338, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992). However, the basis for declaring a procedural default must be an independent and adequate state ground. *See Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 2503, 53 L.Ed.2d 594 (1977). In order for the ground to be independent, the state court must have based its decision on the state procedure in question. *See Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638–39, 86 L.Ed.2d 231 (1985). The procedural bar is "adequate" only if it is a "firmly established and regularly followed state practice." *James v. Kentucky*, 466 U.S. 341, 348–49, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984). Because the sixty-day time limit was directly in conflict with the language of the applicable state statute at the time of the offense, and the state presented no evidence that sixty days was the time regularly imposed upon

---

**2.** While the current version of N.C. GEN. STAT. § 15A–1415(a) requires a defendant to file the MAR within 120 days of the entry of the judgment, the version of the statute applicable at the time Keel was convicted provided that the MAR could be filed "at any time following the judgment." N.C. GEN. STAT. § 15A–1415(a) (1988). Thus, as is stated below, the state may not rely on this bar.

**3.** Originally, the district court barred three more of Keel's claims on the basis of the procedural bar at issue, pursuant to N.C. GEN. STAT. § 15A–1419. However, upon the State's motion to reconsider the ruling, the district court realized that the versions of §§ 1415 and 1419 upon which it relied were not effective at the time Keel was required to file his MAR. Therefore, it rein-

stated Keel's ineffective assistance of counsel claims, claims II.A.(1) (failure to raise a Batson challenge) and II.A.(3) (failure to present diminished capacity evidence at the guilt/innocence phase of the trial), and his cruel and unusual punishment claim, Claim IIB(2) (use of his prior involuntary manslaughter conviction as an aggravating factor). However, in failing to address Claims IIB(1) (due process violation to submit Keel's involuntary manslaughter conviction to the jury as an aggravating factor in sentencing phase) and IIE (failure to inform the jury of Keel's eligibility for parole), the district court let stand the procedural bar on Keel's failure to meet the sixty-day deadline imposed upon him by the North Carolina Supreme Court.

defendants convicted of capital crimes, the bar cannot be considered a "firmly established and regularly followed state practice." *Id.*[4]

However, the removal of the bar does not end our analysis. Although Keel's claims are not procedurally barred, remand still is inappropriate because his claims lack merit as a matter of law. We address them in turn.

■ Keel's first claim is that the State violated his right to due process under the Fifth and Fourteenth Amendments by permitting evidence of his involuntary manslaughter conviction in 1987 to be submitted to the jury as an aggravating factor during the sentencing phase of the trial. The thrust of his argument is two-fold. First, he argues that N.C. GEN. STAT. § 15A–2000(e)(3) (1994), which permits as an aggravating factor the use of a previous felony "involving the use or threat of violence to the person," must as a matter of constitutional law be read to restrict such felonies to those that are intentional crimes. The state supreme court considered and rejected that argument. *See State v. Keel*, 337 N.C. 469, 447 S.E.2d 748, 760 (1994). Keel cites no authority in support of such an extraordinary position, nor are we able to find any.

As a result, any rule we announce requiring that violent felonies used as aggravating factors at sentencing must be felonies requiring specific intent would be a new rule unavailable to the defendant under the "new rule" doctrine established in *Teague v. Lane*,

489 U.S. 288, 295–96, 109 S.Ct. 1060, 1067–68, 103 L.Ed.2d 334 (1989) (holding that new constitutional rules are not applicable to defendants whose convictions have become final before the announcement of the rule). Thus, that argument provides no basis upon which we can reverse the district court's decision.

■ Keel's second argument is that the State violated his Eighth Amendment right to be free of cruel and unusual punishment by essentially relitigating the second degree murder charge for which he was acquitted in 1987. However, the facts of the case in which he was acquitted of second degree murder are the same facts that underlay his conviction of involuntary manslaughter.[5] The state did not characterize his acts as acts of murder during the sentencing phase of the instant case. It merely introduced them to show that Keel committed a felony (involuntary manslaughter) that "involved the use or threat of violence to" the victim. *See* N.C. GEN. STAT. § 15A–2000(e)(3) (1994). Keel cites no authority for the proposition that introduction of historical facts such as these to show that the crime committed was one involving "violence to the person" is improper. *See Tuilaepa v. California*, 512 U.S. 967, 976–77, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994) (noting that sentencing factors that permit the jury to "consider matters of historical fact" are not constitutionally infirm). Therefore, any contrary rule announced here would likewise be unavailable to him under

---

4. We recently rejected North Carolina's attempt to impose a similar procedural bar in *Skipper v. French*, 130 F.3d 603, 613 (4th Cir.1997). In *Skipper*, counsel was appointed on April 17, 1995 for a defendant in a capital case to permit him to file a Motion for Appropriate Relief. *Id.* at 606. The stay of execution was extended until October 16, 1995, although no specific time period was given to the defendant. *Id.* Months later, when the defendant finally filed his MARs, the court dismissed them as having been filed too late, and procedurally barred Skipper from filing further MARs. *Id.* at 607. Skipper petitioned for certiorari to the North Carolina Supreme Court, which the court granted for the limited purpose of denying Skipper relief. *Id.*

In reversing the district court's holding that Skipper's claims had been procedurally defaulted, we examined the procedural bar. When the state superior court entered its order, the 1996 amendments to N.C. GEN. STAT. § 15A–1415(a)

(1995) had not yet become effective. Prior to the amendment, the statute permitted defendants to file a MAR "at any time after the verdict." N.C. GEN. STAT. § 15A–1415(a)(Supp.1994). Since there was no evidence to conclude that the amendment was merely a codification of "a preexisting de facto norm," we concluded that this bar was "apparently unprecedented in state court practice and arguably directly at odds with state positive law." *Id.* As the state still presents no such evidence, the procedural bar cannot stand here, either.

5. Involuntary manslaughter in North Carolina is defined as "(1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission," *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163, 167 (N.C.1984).

*Teague. See* 489 U.S. at 295–96, 109 S.Ct. at 1067–68.

■ Keel's second claim, arguing that his Eighth Amendment right to be free of cruel and unusual punishment was violated when the trial court refused to instruct the jury as to his parole status pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 177–78, 114 S.Ct. 2187, 2200–01, 129 L.Ed.2d 133 (1994), is similarly unfounded. In *Simmons,* the Supreme Court concluded that during the penalty phase, a defendant who is not eligible for parole is entitled to apprise the jury of that fact when the State argues future dangerousness as a basis for imposing the death penalty. *See* 512 U.S. at 171, 114 S.Ct. at 2198 (plurality opinion). We have recognized that Justice O'Connor's concurrence actually represents the holding in *Simmons. See Mu'min v. Pruett,* 125 F.3d 192, 199 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997); *Townes v. Murray,* 68 F.3d 840, 848–49 (4th Cir.1995), *cert. denied,* 516 U.S. 1100, 116 S.Ct. 831, 133 L.Ed.2d 830 (1996).

Justice O'Connor's opinion limits the right to receive such an instruction to those instances where the alternative sentence is life without parole, *see* 512 U.S. at 176–78, 114 S.Ct. at 2200–01. We have repeatedly rejected attempts to expand the *Simmons* rule to apply to prisoners who are eligible for parole. *See, e.g., Wilson v. Greene,* 155 F.3d 396, 407–08 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 536, —— L.Ed.2d —— (1998); *Arnold v. Evatt,* 113 F.3d 1352, 1363 (4th Cir.1997). Since Keel would have been eligible for parole had he not been sentenced to death, *see* N.C. GEN. STAT. § 15A–1371(a)(1) (1994), he is not entitled to any relief under our current interpretation of *Simmons,* and any rule announced here would be barred under *Teague.*

■ Finally, Keel argues that N.C. GEN. STAT. § 15A–2000(e)(3) (1994), which lists the statutory aggravating factors to be con-

sidered by the jury in determining whether to impose death, is unconstitutionally vague and overbroad.[6] The district court incorrectly concluded that Keel failed to raise this argument on direct appeal as required by N.C. GEN. STAT. § 15A–1419(a)(3)(1994).[7] Keel did in fact raise the issue on direct appeal. *See State v. Keel,* 337 N.C. 469, 447 S.E.2d 748, 760 (1994). The North Carolina Supreme Court previously rejected the same argument, holding that the aggravating factors listed in N.C. GEN. STAT. § 15A–2000(e) are not vague. *See State v. Brown,* 320 N.C. 179, 358 S.E.2d 1, 24 (1987); *State v. Rook,* 304 N.C. 201, 283 S.E.2d 732, 746 (1981), *cert. denied,* 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed.2d 155 (1982).

■ The United States Supreme Court has previously stated that vagueness review of the "eligibility and selection factors" attendant to sentencing plans is "quite deferential." *See Tuilaepa,* 512 U.S. at 973, 114 S.Ct. at 2635 (citation omitted). As long as the factor has a "core sense of common meaning," it passes constitutional muster. *See id.* at 973, 114 S.Ct. at 2635–36 (*citing Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)(White J., concurring)). In *Tuilaepa,* for example, the Court upheld a California statutory aggravating factor that permitted the jury to consider whether the defendant had committed a crime "which involved the use or attempted use of force or violence . . . ." 512 U.S. at 976, 114 S.Ct. at 2637. Similarly, the North Carolina statute permits the jury to consider, as an aggravating factor, crimes committed by the defendant that involve "the use or threat of violence" to another human being. N.C. GEN. STAT. § 15A–2000(e)(3). As the North Carolina Statute is legally indistinguishable from the California statute upheld in *Tuilaepa,* Keel's argument fails.

## IV.

Keel next contends that the District Court erred in dismissing his ineffective assistance

6. N.C. GEN. STAT. § 15A–2000(e)(3) states, in relevant part, that an aggravating circumstance exists where "the defendant had been previously convicted of a felony involving the use or threat of violence to the person. . . ."

7. N.C. GEN. STAT. § 15A–1419(a)(3)(1994) states that a court may deny a defendant's MAR where "upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." *Id.*

claim based on his attorney's failure to raise a *Batson* challenge. Because the attorney's failure to raise that challenge did not fall below the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we affirm.

### A. *The Batson Challenge*

Keel contends that because the prosecutor used 9 peremptory challenges to strike African-American prospective jurors—nearly seventy percent of the prosecutor's peremptory challenges—he could establish a prima facie case of discrimination. Therefore, he argues, his attorney should have requested a hearing before the state trial court to require that the prosecutor proffer nondiscriminatory reasons for the challenges.

 Under the three-part test created by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 96–97, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), a defendant may establish a prima facie case of discrimination by the prosecutor by showing that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool. *Id.* The Supreme Court has modified *Batson* to allow defendants of races different than the excused jurors to have standing to raise *Batson* challenges. *See Powers v. Ohio*, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Once the defendant establishes a prima facie case, the burden shifts to the prosecution to advance a non-discriminatory reason for the exercise of the peremptory challenges.[8] *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. The trial court then determines whether the defendant has proven intentional discrimination. *Id.; Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

 Looking at the record, Keel cannot establish a prima facie case, and thus was not entitled to a hearing. Although the prosecutor did exercise the peremptory challenges to excuse African-American jurors, the surrounding facts and circumstances do not support a finding of discrimination.

 First, neither the defendant nor the victim is of the same race as the jury. While the defendant need not be a member of the same race as the excused jurors in order to raise a *Batson* challenge, *see Powers*, 499 U.S. at 415, 111 S.Ct. 1364, that Keel and the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race.

 Second, and more important, the record reflects that the jurors in question were asked pointed questions about the death penalty and each responded with some degree of hesitation about imposing the death penalty. The jurors were immediately excused thereafter. Moreover, the prosecutor excused 10 other jurors for cause who were adamantly opposed to the death penalty and stated that they would automatically vote against the death penalty. Given these jurors' opposition to, or hesitation toward, imposing the death penalty, it is clear that the prosecutor acted well within constitutional bounds in excusing them. *See Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (holding that exclusion for cause is proper where " '[a juror's] views [on the death penalty] would 'prevent or substantially impair the performance of his duties as a juror....' '"); *Brown v. Dixon*, 891 F.2d 490, 496–98 (4th Cir.1989) (holding that the prosecutor may properly use peremptory challenges to create a jury inclined to impose the death penalty).[9] Thus, Keel's failure to establish a prima facie case vitiates any entitlement to a hearing.

---

8. Keel appears to argue that a defendant may establish a prima facie *Batson* claim merely by showing that the prosecutor excused several members of the jury pool who share the same race. However, as stated above, that is only *one* of the three factors identified by the Supreme Court in *Batson*.

9. North Carolina has also adopted this rule. *See State v. Gibbs*, 335 N.C. 1, 436 S.E.2d 321, 337 (1993).

■ Furthermore, Keel's claim of ineffective assistance of counsel because counsel did not assign as error on direct appeal the failure to raise a *Batson* challenge should be dismissed for similar reasons. As noted above, exercising peremptory challenges to strike potential jurors for responses that may not rise to the level of cause is perfectly acceptable. *See Hernandez,* 500 U.S. at 362, 111 S.Ct. 1859. As it appears that the prosecutors did just that with regard to the jurors' responses to death penalty inquiries, no hearing was necessary.

### B. *The Strickland issue*

■ Even if Keel could have established a prima facie case, counsel's failure to raise the issue does not constitute ineffective assistance of counsel. In order to prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's conduct fell below the conduct reasonably expected of counsel, as measured objectively and (2) the defendant was actually prejudiced by counsel's substandard conduct. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

■ Here, counsel's failure to raise the *Batson* issue was reasonable. As stated above, there is ample evidence in the record to suggest racially neutral reasons for excusing the nine jurors. Thus, there is no need to reach the question of whether Keel was actually prejudiced. Moreover, appellate counsel is not required to raise an issue on appeal merely because it is not frivolous. *See Jones v. Barnes,* 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983). Since both sets of counsel could reasonably have concluded that there was sufficient evidence to conclude that there was no *Batson* violation, their failure to raise the issue does not give rise to an ineffective assistance of counsel claim. *See Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)(stating that appellate counsel need not pursue a futile issue).

### V.

■ Keel next contends that counsel was ineffective because of his failure to introduce the evidence of diminished capacity due to cocaine and alcohol. He essentially argues that counsel should have presented expert testimony to show that the effect of the cocaine and alcohol he used the day of the murder impaired his ability to premeditate. Again, the *Strickland* rule applies. Because it appears from the record that Keel can establish neither unreasonable behavior by counsel nor actual prejudice, we affirm.

### A. *Was it unreasonable for counsel to decline to introduce the expert testimony?*

The record reflects that Keel's counsel presented expert testimony regarding his drug use and emotional problems during the penalty phase of the trial. Counsel first presented the expert testimony of Dr. Weiner, a forensic psychiatrist in North Carolina. Weiner testified as to Keel's history of drug abuse and emotional problems.

However, on both direct examination and cross examination, Dr. Weiner admitted that Keel "solved his problems by fighting." Moreover, Weiner testified that Keel could "hold a job ... he can get by on minimum standards." Finally, Weiner testified that Keel told him before the night of the murder that "he was going to resolve [arguments between himself and Simmons] by taking him (Simmons) out and beating him up."

Counsel also presented the testimony of Dr. Robert Conder, a neuropsychologist. While Dr. Conder testified that Keel had engaged in many activities that had killed brain cells, and had a below average IQ, he also admitted on cross examination that Keel could think, plan, and hold a job.

To the extent that counsel discussed the case and the testimony with the experts before trial, as it appears in the record that he did, he may reasonably have concluded that, on balance, the testimony would not have been helpful during the guilt phase. This is the type of decision making by counsel that *Strickland* protects. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052 (holding that

there was not ineffective assistance of counsel where counsel declined to present mitigating evidence at the penalty stage because of possible exposure to damaging evidence during cross-examination).

### B. *There is no Actual Prejudice.*

■ Moreover, there was no actual prejudice. Given that the experts' testimony was as harmful as it was helpful to Keel, the District Court properly dismissed Keel's claim without a hearing. Although it is true that a defendant in North Carolina may not be convicted of first degree murder if she or he does not have the mental capacity to form intent, to premeditate or to deliberate, *State v. Cooper*, 286 N.C. 549, 572, 213 S.E.2d 305 (1975), that does not appear to be the case here. In fact, the experts admitted on cross-examination that Keel was capable of planning, thinking, and, most importantly, planning to harm the victim in the future. Furthermore, there is the additional evidence against Keel which the District Court references.

Finally, the damaging testimony as recounted above distinguishes the instant case from *State v. Daniel*, 333 N.C. 756, 429 S.E.2d 724 (1993), upon which Keel relies. In that case, counsel attempted to introduce evidence from a physician that showed that the defendant's substance abuse had so impaired his cognitive functions that he was unable to form the specific intent necessary to commit first degree murder. That finding is distinguishable from the record in the instant case, where the examining physicians testified that Keel harbored animosity toward the victim and planned to harm him in a future encounter. Thus, Keel cannot show that had this evidence been introduced, he would not have been convicted of first degree murder.

### CONCLUSION

To review, we find that Keel's arguments are not procedurally barred, but affirm because those arguments lack merit. We also affirm the district court's rulings as to the merits of all of Keel's other claims.

*AFFIRMED.*